## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-CR-133-JFJ |
| | ) | |
| BOLUTIFE OLUSEGUN | ) | |
| OLORUNDA, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT BOLUTIFE OLORUNDA'S SENTECING MEMORANDUM

COMES NOW, Defendant Bolutife Olusegun Olorunda (hereinafter "Mr. Olorunda"), who submits this Sentencing Memorandum to aid the Court in determining an appropriate sentence. While the information in this memorandum is composed primarily of 3553(a) factors, according to the Plea Agreement with the United States, Mr. Olorunda is not requesting a specific sentence. The Court, however, must be informed of specific issues regarding the nature of the offense and Mr. Olorunda's character to make an informed decision and so that counsel is not abdicating his ability to promote his client's interests.

### Procedural History

A Complaint alleging a violation of 49 U.S.C. § 46504 – Interference With Flight Crew Members and Attendants was filed on May 31, 2018. Later, on June 5, 2018, the grand jury returned an Indictment charging Mr. Olorunda with the same violation of 49 U.S.C. § 46504. Mr. Olorunda appeared on June 6, 2018, for his Arraignment. One month later, on July 6, 2018, a new misdemeanor

1

Information was filed, and Mr. Olorunda appeared for his Arraignment and Change of Plea four days later on July 10, 2018.

**Facts Regarding the Offense**

While the facts of this case are straightforward, the path that led Mr. Olorunda to Tulsa is far from simple. On May 30, 2018, Mr. Olorunda boarded Delta Airlines Flight 1156 from Portland to Atlanta. During the flight, Mr. Olorunda donned his headphones and began listening to music. As the trip progressed, Mr. Olorunda began to sing to himself and sway in his seat. His singing and swaying continually became louder and much more pronounced. As his behavior escalated, the flight attendants tried to get Mr. Olorunda's attention, but he failed to recognize or acknowledge their presence.

After an extended bout of loud singing and swaying in his seat, the Air Marshals broke their cover. One Air Marshal went to guard the cockpit while the other Air Marshal went to the back of the plane to address Mr. Olorunda directly. When the Air Marshal reached to remove Mr. Olorunda's headphones, he swatted her hand causing her to graze his headphones and cutting her finger. After this incident, the pilot and flight crew decided to make an emergency landing at Tulsa International Airport.

After being escorted from the plane, Mr. Olorunda can be seen on local news footage exclaiming that, "God is coming!" as he was taken into custody. While being interviewed, however, his demeanor could not be more opposite. His responses to the officers questioning him regarding his desire to dance are barely

2

audible. He was withdrawn and quiet, nothing like the sharp, analytical individual he is on a day-to-day basis.

How did this happen? How does a bright second-generation immigrant with an advanced degree, great career, a thriving business, and supportive family find himself on the charging end of a Federal Information? This memorandum is meant to explain how this Court received a promising young professional before it for sentencing.

Approximately two months before he boarded the flight from Portland to Atlanta, Mr. Olorunda and his wife finalized their divorce. She wanted to move to New York City, and Mr. Olorunda wished to stay on the west coast in Vancouver, Washington where his business was thriving. Mr. Olorunda wanted to start a family and settle down, and his wife wanted the fast-paced lifestyle and career in a big city. The extreme difference in their goals and ideal lifestyle drove them apart, and after three years of marriage, they filed for divorce.

Prior to the decree being finalized, Mr. Olorunda threw himself into his work. He would routinely work 16 to 18-hour days and frequently skipped meals in order to burrow down into whatever task was at hand. The work distracted Mr. Olorunda from his failing marriage and the realization that the woman whom he spent the last three years building a life with no longer wanted the same things he did.

The flight that Mr. Olorunda took on May 30, 2018, was the first time had stepped away from work for several months. It was there, wedged in an

uncomfortable airplane seat, that the music and emotion of his failed marriage took hold and got the better of him. All of the unresolved pain and doubt broke free and came to the surface at the worst possible time and in a way that Mr. Olorunda was not prepared to handle.

### Discussion of Factors Regarding Mr. Olorunda

**1. Defendant's Aberrant Behavior.**

Mr. Olorunda takes full responsibility for what happened on the plane on May 30. He scared many people and created an emergency where one should not exist. This extended outburst is not, however, a reflection of who he is or his manners and composure. The long hours sitting still and forced silence during the course of the flight was the first time in a long time Mr. Olorunda had been alone with his thoughts. Somewhere over western Oklahoma was when the immense pressure of divorce and his brief respite from work, the doors opened for all of the unresolved pain to come to the surface.

While there is no scientific research to support this reasoning, there is an abundance of shared experiences and plenty of anecdotal evidence that support the notion that people can become uncontrollably emotional on flights. Elijah Wolfson, *Why We Cry on Planes*, The Atlantic, Oct. 1, 2013, https://www.theatlantic.com/health/archive/2013/10/why-we-cry-on-planes/280143/. It is reasonable that the stress of the divorce mixed with an environment conducive to emotional displays led to Mr. Olorunda's outburst.

Mr. Olorunda's outburst was one instance of aberrant behavior. In *U.S. v. Jones*, 158 F.3d 492 (10th Cir. 1998), the defendant pled guilty to possession of a firearm by a prohibited person, the district court did not abuse its discretion in departing downward by three levels to probation when, as one of eleven factors, it considered that crime was aberrant conduct where the defendant had been law-abiding until age 35 when his marriage disintegrated. In this case, Mr. Olorunda's marriage had just ended which led him into a downward spiral in which he worked extreme hours and displayed a lack of care for his mental and physical health.

**2. Defendant's Collateral Consequences**

The consequences of Mr. Olorunda's actions do not end October 10, 2018. Two other federal agencies may assess fines for bringing down the flight. The Federal Aviation Administration (FAA) and the Transportation Safety Administration (TSA) may both levy incredible penalties after the immediate proceedings. Previous fines assessed by the FAA have been as high as $70,000.00, leading to a significant financial impact. Mr. Olorunda will appear at sentencing with the full restitution amount ready to be paid to the Clerk of the Court so that Delta Airlines will be made whole again.

Another collateral consequence of this prosecution has been Mr. Olorunda's career. In order to satisfy his terms of pre-trail release, Mr. Olorunda closed his thriving real estate business in Vancouver, Washington and moved home to Muncie, Indiana. As a result of the move, Mr. Olorunda has had to take

another 90-hour real estate licensing certification class so he can sell real estate in Indiana because his Washington real estate license did not transfer. Additionally, Mr. Olorunda's worst moment has been plastered all over national and international news. As a young professional trying to restart his career in another state, he will have the media's accounts of one of the worst days of his life following his name online. In a profession where trust and reputation are paramount, this will always be a handicap for Mr. Olorunda.

In *U.S. v. Dvortsen*, 2007 WL 3342578, (E.D. Wis. Nov. 9, 2007) (unpub.), the court departed from a guideline sentence of 57-71 months for a money laundering case to a sentence of one year and one day because "defendant had been significantly punished by the monetary forfeitures imposed in this case, which he fully satisfied prior to sentencing and which forced him to disgorge any ill-gotten gains. He paid a heavy financial price, which at least partially satisfied the need for punishment." *Id.* at 2.

The impact of Mr. Olorunda's conduct reaches beyond this courtroom and will follow him for many years to come. Mr. Olorunda's previous success in Washington is not a guarantee of future success in Indiana. Starting over from scratch in a very competitive industry that is in a different market is a daunting task for any professional no matter how much experience they already have.

### 3. Post-Offense Rehabilitation

A natural concern of this Court may be whether or not an incident like this will happen again. Mr. Olorunda underwent a psychological evaluation as well

as enrolling in anger management classes. Mr. Olorunda has also taken a 10-panel drug test which returned negative for all of the listed drugs. Mr. Olorunda has started regularly attending church and has taken the position of usher. Additionally, Mr. Olorunda is in the process of being approved to help a local community service project in Muncie, Indiana that focuses on childhood activities and development through farming and other afterschool programs.

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court upheld a probation-only sentence where a defendant withdrew from the conspiracy, enrolled in college, and rehabilitated himself into a respectable businessman. The primary reason the Court upheld the probation sentence was that imprisonment was no longer necessary to protect the public from any future crime he might commit.

Here, with Mr. Olorunda, we have a one-off incident that he is addressing through anger management. Perhaps, more important than the anger management classes are the efforts Mr. Olorunda is undertaking on his own to address his happiness and mental health during this time of transition. Currently, Mr. Olorunda lives at home in Indiana surrounded by friends and family. He is no longer working 16 to 18-hour days to avoid dealing with the loss of his marriage, and he adjusting well to a much happier and relaxed environment.

## **CONCLUSION AND PRAYER**

WHEREFORE, Defendant Bolutife Olorunda, through counsel, respectfully prays that the Court determine the appropriate but fair sentence – one that reprimands but also gives hope and shows mercy. His actions scared a raft of strangers and placed himself and others in danger while on the flight.

Mr. Olorunda takes full responsibility for his actions and regrets what he did that day.  He understands that he deserves whatever punishment the Court assigns to him and will show the Court that second chances carry grave responsibilities.

**Dated:** September 26, 2018

Respectfully Submitted;

/s/ Clinton R. James
Clinton R. James, OBA #31106
WYATT LAW OFFICE
525 S. Main Street, Ste. 535
Tulsa, Oklahoma 74103
(918) 594-0000 - Telephone
(918) 515-7897 – Facsimile

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing instrument was submitted to the CM/ECF filing system for electronic filing under seal on the 26th day of September 2018 and separately emailed to the following attorney of record:

Robert Raley
Rob.Raley@usdoj.gov


_/s/Clint James_____
Clinton R. James

## SUPPORTING DOCUMENTATION

Drug Test...................................................................................Attachment 1

Anger Management Certificate.................................................Attachment 2